Our next case is SYSTEM FUELS v. United States. Help me with your name a bit. Alex Tomaszczuk, Your Honor. Tomaszczuk. Welcome, Mr. Tomaszczuk. Good afternoon. May it please the Court. The plaintiff's appellants, which for ease of reference I will refer to today as Entergy, asked this Court to reverse the trial court's decision denying Entergy's claims for cost of capital and its capital suspense loader damages. Let me turn first to Entergy's cost of capital claim. We submit that the trial court erred in concluding that this Court's decision in England v. Contell precluded the award of Entergy's reasonable cost of capital damages. As the trial court properly determined, Entergy incurred significant costs to construct and operate on-site dry fuel storage at Grand Gulf, the plant at issue, to mitigate DOE's partial breach. The trial court also properly determined that Entergy incurred significant costs of capital damages to finance these projects. However, we submit the trial court erred in ultimately construing England as a legal bar to the recovery of these costs. England and the various cases cited therein, such as Meyerly and J.D. Hayden, preclude the recovery of interest on a claim absent an express waiver of sovereign immunity. The Supreme Court in Shaw recognizes this very difference by pointing out that the no-interest rule applies to interest on a recovery against the United States. That's 478 U.S. at 316. But that rule and the England line of cases are not applicable here. What Entergy seeks in this case is the recovery of financing costs attributable to the need to store spent fuel at the Grand Gulf site in 2006 and beyond. How do you distinguish that from a claim based on delay in payment? Because if the government had paid these extra costs right away, there wouldn't have been any financing costs, right? Financing costs were incurred as a result of the delay in payment. Financing costs were incurred as a result of Entergy's need to build dry fuel storage at the plant. But they were, is not my statement correct, that they were incurred because the government didn't immediately reimburse the cost. They were incurred because there was a delay in payment. I'm sorry, Your Honor. With all due respect, we submit that they were incurred because Entergy was placed in a position of having to perform for the government. This is very different. If the government had paid the costs right away, there wouldn't be any claim for financing costs, right? If the government had paid all of these costs right away, I would not be here at all. There wouldn't be any dry fuel storage costs. These costs that are at issue are very much like the concrete, like the canisters, like the engineering design work. They are part and parcel of a claim for costs. And I should note, Your Honor, that in this particular case, and what I think distinguishes this from, with all due respect, the England case and the Meyerly case and the Hayden case, is that in this circumstance, our obligation was to pay money. We're not seeking financing costs associated with that obligation. We never expected at the time this contract was executed that we were going to have to be building a dry fuel storage facility at the Grand Gulf Plant. But England says very clearly that this kind of claim cannot apply to money borrowed as a result of the delay of the claim. Doesn't that make Judge Dyke's question the critical question? I would submit that it does not, Your Honor, because in England, in particular, there was a contract for telecommunications services, and there was a delay in government by the payment of invoices for those services. That's a very different circumstance when here, when our obligation under the contract is to pay money, and we continue to do that. It was never our obligation to have to go out, design, site, and build a dry fuel storage facility. The government's obligation under the contract in exchange for our payment of money, the quid pro quo, if you will, was the government has this obligation to come out and pick up the spent fuel. They never did that, and that's why this is a mitigation case, and we submit it's fundamentally different from the England and Miley and that line of cases. What we are seeking are costs, and they are costs just as much as having to design the facility and pour the concrete, and there's nothing in the statute, there's nothing in Shaw or any other precedent of this Court that precludes the recovery of costs, and indeed in cases like Indiana, Michigan, for example, which this Court decided involving spent fuel cases. The Court specifically held, citing the provision of the restatement, section 347, that all losses, however described, are recoverable, and the Court favorably cites that in its decision in Indiana, Michigan. You also have the entire line of Winstar cases. That would indicate that England and the cases that are relied on were wrong, right? I don't think they're wrong, Your Honor. I think they are distinguishable. I think this Court can and should reverse the lower court decision in this case and can do so without reversing England. England involved classic circumstances where there was a claim by a contractor who was providing services to the government and the government for some reason delayed. The contractor always knew that it had the risk, if there was going to be a delay in payment by the government, that they might not be able to vet financing costs. We never assumed in this particular contract that we would have to undertake to build a dry fuel storage facility. That was the government's obligation to pick up our spent fuel. Our obligation was to pay money. But I'm not here seeking financing costs associated with our obligation to make the one-time fee or the quarterly fee payments to the government. This is a very different type of undertaking. This is part and parcel of our obligation to go out and have to construct this dry fuel storage facility. And those costs we submit are fully cognizable under Indiana, Michigan, and that the Court could reverse and should reverse the lower court and can do so without setting aside, if you will, the England and those line of cases. I would also note that there are a series of Winstar cases that speak to this issue, Bluebonnet being one primary example, where the contractor in that circumstance, or the party to the contract, was able to recover financing costs. Indeed, I believe in the Bluebonnet case it was $5.4 million. Now there was no express... Your Honor, I'm not sure if the Bluebonnet case cited Shaw, but I'm not sure that it needed to because we would submit that we are very much akin to the Winstar plaintiffs, where you have an undertaking by the government. In the Winstar context, it was associated with supervisory goodwill, and the government had promised the entities that were litigating those cases that they were entitled to the benefit of that. And there were financing costs associated with that, and this Court in Bluebonnet affirmed an award of $5.4 million. But all these have the same thing in common. You have a breach, and then you have some financing costs to compensate for the breach. I think Library v. Shaw says that's not compensable. Sovereign immunity hasn't been waived. Well, I would submit, Your Honor, that... Are you alleging there's a waiver of sovereign immunity here? I'm alleging that there is a waiver of sovereign immunity, but it's the same waiver of sovereign immunity associated with our claim for the dry fuel storage facility itself. The Tucker Act. Yes, Your Honor, the Tucker Act. And the Tucker Act doesn't speak specifically to the types of costs that can be recovered by a plaintiff utility in these circumstances. What was at issue in Library v. Shaw, I would note, was a Title VII case involving attorney's fees and the delayed payment of those attorney's fees. And the Supreme Court in that case held, no, we're not going to allow that. But they did use that particular language that I would call to the Court's attention, namely the recovery of costs on a claim. And I would submit, Your Honor, that... What do we do about the statute barring interest against the government? Well, that statute does specifically speak to interest on a claim, and that would be Section 2516A, interest on a claim against the United States. You said the same thing in England, that it was interest as a claim rather than on a claim. That just seems like semantics. I don't think it is, Your Honor, when one considers the fundamental purpose of these contracts. The fundamental purpose that was at stake here was we pay money, and we've been doing that, and the government was to pick up the spent fuel. I think it is clearly distinguishable when you have a circumstance where one party to the contract, as happened in the Winstar cases, has to undertake a wholly different set of circumstances that were far above and beyond what was ever envisioned by that contractor. And that's what Entergy has had to do here in this case and in other cases. And it seems to me that that does create a meaningful distinction to that between interest on a claim, which we are not seeking, and interest as a claim. This is the same type of cost that are part and parcel of the substance of the claim, which the lower court largely granted, the cost associated with having to build a dry fuel storage facility, to design this facility. You have a breach, and now you are compensating for that breach. What is the claim? What's on the claim, and what is the claim there? Isn't it all the same thing? I'm trying to figure out why this is a separate claim when it's financing costs for the breach. It's one claim, Your Honor, of which financing costs, our weighted average cost of capital, is a component. And my argument is that that constitutes interest as a claim, which is not barred either by the liberal language of the statute or by the England v. Contell or the other cases cited therein. This is not a circumstance where we have a- Is this a question of pleading, then? As long as you plead it as a claim, you get it? No. If you just try and take it, otherwise you lose. Is that what it is? I don't think it's a matter of pleading. I think it's far more substantive and, frankly, important than that. I think it goes to the heart of what was the quid pro quo in the case, what were the reasonable expectations of the parties at the time of contracting, and what is the remedy to which we're entitled. If the language in Indiana, Michigan, has meaning that we are entitled to be made whole as a result of the government's breach, I think the court has to come squarely face-to-face with the question is, absent the recovery of these costs, which go back to 1999, we're not made whole. So it goes far beyond a mere pleading matter. Does your claim draw a distinction between the cost of capital that may have been borrowed in order to build these extra facilities and roads and so on, or capital that may have not had to be borrowed but might have been diverted from other uses? It did distinguish between those two. The claim as originally submitted to the lower court included both, and we would submit that both are permissible under this court's ruling in LaSalle-Talman, another Winstar case. But in point of fact, Judge Braden, the trial judge below, had several rounds of briefing on the precise computation. At the end of the day, she concludes, essentially, that the $1.5 million that we seek was appropriate and supported by the testimony of our expert. But to answer the court's question, it did include both as originally submitted, but there were also breakdowns which segregated debt from equity. Under LaSalle-Talman, though, Your Honor, we would submit that we would be entitled to recover both. Would you like to save the rest of your rebuttal time? I would, very much so. Thank you. Thank you, Mr. Thomas. Mr. Lohre? May it please the court. As the court is aware, the government is cross-appellant in this matter, and I will address the appeal, this discrete issue that we're appealing, but I would like to start by discussing the issues that the plaintiff has raised on appeal. That is the interest, which, incidentally, is being heard by a panel earlier today. A panel in the E&W case heard a very similar argument and will also be heard on Thursday in the SFI Arkansas case. I will also address the overheads claim that the plaintiff is appealing. With respect to interest, this court should affirm that portion of the trial court's judgment in rejecting plaintiff's claim for interest for the simple reason that the clear jurisprudence of both this circuit and the United States Supreme Court, as the court discussed with Mr. Thomas Chuck, hold that a party may only recover interest against the government if that party establishes that the no-interest rule has been waived by express, clear, and unambiguous contractual provision, statute, or express consent of Congress. Additionally, that permits recovery... What about Mr. Thomas Chuck's point, well taken, that there's no way to make him whole if you deny him this form of recovery? In many ways, Your Honor, this case starts and ends with the Shaw case, as I believe Judge Dyke was asking about. In Shaw, the Supreme Court said interest and delay are an identical function, both of which are designed to compensate the belated receipt of money. That's exactly what the plaintiff is asking for in this case. Plaintiff's expert admitted on the record... So you're not going to answer my question? No, Your Honor, I'd be happy to answer your question. The question is, are you then saying you do not wish to make him whole? In order to make him whole, you're going to have to compensate him for this, right? The fact is, if making him whole is to pay him interest, then we are not making him whole. But the fact, but the corollary to that is that there is a statute and there is a long line of case law that says that absent an express waiver, because remember, we're talking about the waiver of sovereign immunity, absent an express waiver by the United States, a party may not recover interest. The Tucker Act waives sovereign immunity under the circumstances of claims against the United States. What else do you need? I'm sorry. Certainly the Contract Disputes Act waives sovereign immunity. That's true. I'm talking about the Tucker Act. There's no provision under which these plaintiffs have sued that expressly waives the immunity from the government for interest. The Tucker Act is a very short statute. It doesn't draw any distinction as to the source of the obligation. Well, Your Honor, I would say to that that with respect to the Tucker Act, you've got to also look at 28 U.S.C. 2615, which expressly says that a plaintiff may not recover interest against the government. What do you do with Blue Bonnet and Wickham? I'll take each individually, Your Honor, because I think there is a distinction there. Blue Bonnet is a case, a Winstar case, as the Court is familiar, where in that case the contract itself was for financing and the purpose of that contract was to avoid interest payments. When the government breached that contract, the thrift had to finance and thus had to pay interest. That was the very thing that the plaintiffs were trying to avoid as part of that contract. In that case, that is the actual reason for the contract. In this case, by contrast, the purpose of this contract was to the acceptance of spent fuel. Now, admittedly, the plaintiff had to go out and build a dry storage facility. We're not challenging that here. But that is what they had to do. So like Blue Bonnet, they had to do something, but unlike Blue Bonnet, the purpose of the contract in Blue Bonnet was the financing itself. That's distinguishable. And, in fact, that goes to why this really is under Shaw just a question of the time value of money because that delay, as was addressed with Mr. Tomaszczuk when he was up here, the fact that if the government had been paying every time that that contractor was building its dry storage facility, if we had been paying them, there would be no claim here for interest. So we have made them, perhaps not whole, but we certainly have paid them for the damages accrued as part of the delay. Whereas in Blue Bonnet, prompt payment would have diminished the claim. Exactly right, Your Honor. Prompt payment would have made no difference. But 2516 requires an express waiver. There was no express waiver in Blue Bonnet. That's correct, Your Honor. There was no express waiver. However, again, that was, I believe it's really an issue of the calculation of damages versus the calculation of interest on damages because in Blue Bonnet, as I said, that was Getting awful close to on a claim or as a claim, isn't it? Well, it is, but I would agree with Judge Dyke that I don't think there really is a distinction here because the fact is that we didn't waive, and this is a different circumstance. We can talk about Blue Bonnet all day, but this is quite a different circumstance. The Nuclear Waste Policy Act, the statutes that were promulgated pursuant to the Nuclear Waste Policy Act say nothing about covering interest. I'd also like to address the Court's question about Wickham. The Wickham line of cases address a very specific circumstance where under a changes clause, the government has agreed that it will permit the plaintiff to recover damages. The line of cases starts way back with the case of Bell, which this Court is familiar with, where the Court in that case said specifically that there was a distinction between a claim for equitable adjustment under a changes clause and a breach. So that line of cases, the Wickham line of cases, say very clearly that if you are under a changes clause and for an equitable adjustment claim, yes, perhaps you are entitled to interest, but that's not what the situation is here. Also, I'd like to add that really this case is a non-starter because of the fact, and I believe it was Judge Newman who asked about this, this notion of specific borrowings. Even if the plaintiff in this case could overcome the hurdle of Wickham, that is somehow force itself into a situation where it was entitled to circumvent the no-interest rule, the cases including England, Heaton, Framlow, and Shaw all say that there has to be specific borrowings, not only specific borrowings, but specific borrowings caused by the breach. In this case, not only caused by the breach, but forced. In other words, the plaintiff had no alternative. In this case, the plaintiff admitted at trial that it wasn't forced to borrow as a result of the breach, it chose to borrow as a result of the breach. That's an important distinction. Further, the borrowings in this case were prepared through both debt and equity financing. The line of cases including Wickham say that equity financing is not recoverable, even in a circumstance where you were able to get over the hurdle of the no-interest rule. You get to that if you accept the principle. The idea is indeed to make this entity whole because of the government's breach. Only if, Your Honor, again going back to Judge Rader's question, only if the government has agreed to pay interest. Under the Tucker Act. We would submit, Your Honor, under the Tucker Act, that is not an express agreement. That's not enough to get over the hurdle. In fact, in Shaw, there was the, I believe it was Title VII, where the question was whether the party could be, I think it was just compensation, or treated like a private party. The government could be treated like a private party. But the court in that case, the Supreme Court said, Title VII wasn't enough to get over that express waiver provision. I'd like to turn briefly, if I may, to the overheads. On the overheads, the difference between the two of you, that you say that there has to be extra overhead expense as a result of the breach, whereas they're saying that as long as the overhead fixed costs were used in part to remedy the breach, that it ought to be recovered. Is that the difference between you? Well, really the difference between us is that we see this, Your Honor, as a fact-finding question. The court made a finding that there weren't, that resources for this capital suspense loader were not diverted to the breach-related activities. It's really as simple as that. The court looked at this and said, I can't tell. First, I can't tell, excuse me, the court couldn't tell whether the amount of time that any employees spent on this capital suspense loader was expended on the dry storage project. And then secondly, the court found that the plaintiff could not show whether the dry storage project had an effect on either increasing or decreasing the costs associated with the larger pool, the capital suspense loader across all the companies. And so simply, the court found that I cannot show, the plaintiff has not shown that absent the breach, or because of the breach, rather, there was a diversion of funds. It's as simple as that. Now that's contrasted, Your Honor, with the court... What do you mean that they weren't required to go to additional overhead expenses? They didn't take time that would have otherwise been, that these employees would have been working on some other projects. They didn't take those employees off and say, okay, now we're going to put your overhead onto this portion of overhead related... I thought those employees did spend some time on the remedy of the breach. Well, it's unclear from the record. In fact, what the court said is that she could not tell how much time they spent. You're saying that they spent absolutely no time of more than 30 minutes duration? We don't know that from the record, Your Honor. And we don't know if at the end of the day, the court simply couldn't determine whether there had been resources diverted from the larger capital suspense loader pool to the dry storage projects. Suppose you have the president of the company, and he's got a fixed salary, he's going to be there whether there's a breach or not, right? But the truth is that he gets involved in the remedy of the breach, and he spends 15% of his time on the breach. Are you saying that he can't recover any overhead attributable to that time that he spent? No, we're not saying that, Your Honor. But what we're saying is that the plaintiff needs to be held to a burden to show that that overhead, that some portion of the overhead that that individual is billing to, was diverted to the breach. And that's simply what the plaintiff... It's not terribly complicated what the court did. With respect to materials loader, on the other hand, the court did say that there was enough to show that there was a diversion. We're not saying in no circumstances could that overhead that the court just described be recovered. We're just saying that in order to recover it, we have to show that the capital suspense pool, that larger pool, resources from it were diverted to cover this, the breach. I see you're selling your time there. Thank you, Your Honor. Your Honor, I do note I have a cross appeal, so if I could address that quickly or... Okay, just very briefly, Your Honor. The court should find that the trial court did err by failing to require plaintiff to establish its condition with timely performance by DOE, as this violates both the general tenets of recovery of damages for expectation damages, and specifically this court's ruling in the Yankee atomic case. With respect to the modifications of the plant and with respect to the so-called haul path, which is the thing that the utility takes the casks out of the building and into the, would deliver to DOE, with respect to those two issues, the court simply did not require the plaintiff to show any evidence that if DOE had actually timely performed, that those costs would have also been incurred. And that is error that should be remanded. All right. Thank you, Mr. Lorraine. Mr. Thomas Chuck. Thank you, Your Honor. Very briefly, with respect to overheads, there was testimony in the record, and this appears in the joint appendix at 348 and 349. It was by Lisa DiBella-Saragusa, and she manages these capital suspense loaders for Entergy. The personnel who bill their time to capital suspense include both centralized corporate personnel, the CEO on down, as well as engineers and other individuals who are at the site and who are also at Entergy's nuclear facility. So there was testimony in the record that these individuals were working some of their time on activities associated with the Grand Gulf spent nuclear. How do you understand the Court of Federal Claims to have said what's wrong with your group? I think the Court of Federal Claims erred, and it didn't have the benefit of this Court's decision in Carolina Power and Light. I think it erred in applying a standard of proof which no one could meet with respect to proving overheads. She was essentially requiring us to show that individuals could be allocated and charged direct to the dry fuel storage project, but that's not how indirect costs like these capital suspense overhead are accounted for. They go into a pool. The individuals, if they're working on it for less than 30 minutes, that goes into the capital suspense pool, and then those pool costs are allocated to a host of capital projects, including but not limited to the Grand Gulf capital suspense, the dry fuel storage projects. Based on the cost of the project, relative cost of the project? Based on the relative cost of the project, and those costs are reviewed quarterly, and then the pool costs are readjusted as necessary. Those are exactly, exactly the type of indirect overheads. That's the words that the Court used in the Carolina Power and Light case, which was decided several years later. Judge Brayden, we respectfully submit, applied the wrong legal standard with respect to the recoverability of indirect overhead costs. Let me just say one or two words before my time expires on the government's cross-appeal. We submit that on that issue, Judge Brayden correctly found that the costs that the government is now challenging, approximately $2.2 million in plant modification costs, were part and parcel of the dry fuel storage project. On remand, she specifically applied the acceptance rates in the Yankee Atomic case and concluded on remand that those costs were appropriate, as were the bulk of the dry fuel storage project. I would note that the contract also requires the Department of Energy to provide a cask that is suitable for use at the site that's in the joint appendix at 1518, so no modifications to the plant should have been necessary at all. For that reason, the government's cross-appeal should be rejected. My time is up. I'd love to say more about cost of capital, but thanks. Thank you. Lorraine? Thank you, Your Honor. With respect to overheads, the Carolina Power, to be clear, in Carolina Power, the court held that the undisputed record showed that the plaintiff diverted warehousing and management resources to mitigation projects. That is lacking in this case. This court expressly did not find that, so there was no finding that there were resources diverted from a larger pool to this specific dry cask effort. Finally, with respect to the government's cross-appeal, on remand, the government, Mr. Tomaszczyk mentioned that the court applied the 1987 ACR rate, and we found that to be noteworthy because, in fact, the court did perform the required analysis under Yankee Atomic when it said that there were certain fuel cell recovery items that the court said this utility would have engaged in those even if DOE had performed. In other words, very much like in Indiana, Michigan, where the court said, irrespective of the breach, you would have still expended these costs. But what the court didn't do with respect to the modifications and the haul path was to perform any analysis whatsoever. Mr. Tomaszczyk also says that the contract said that the cask would need to be suitable for use. Well, certainly that doesn't mean that you would make absolutely no mods for the plant. As a matter of fact, and this is in the record additionally, Your Honors, the plaintiffs themselves recognized that they would have to make certain modifications to the plant if DOE came with a particular cask because there's a long lag time when DOE shows up. They don't just show up with a cask utility to know years in advance. And they took a cask, indeed a cask very similar to the one that they used to load to their asphyxia, and they modeled that and said, we would need to make modifications. Those modifications are what we were unable to determine because the court did not hold the plaintiff to its standard of showing under Yankee. Thank you, Your Honor.